1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

BERTHA E. FLEMING,

        Plaintiff,

11

12

    v.

CASE NO.    C04-5711RBL

REPORT AND
RECOMMENDATION

Noted for August 26, 2005

13

JO ANNE B. BARNHART, Commissioner of
Social Security,

14

        Defendant.

15

16

17

18

19

    Plaintiff, Bertha E. Fleming, has brought this matter for judicial review of the denial of her

20

applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has

21

been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local

22

Magistrates Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261

23

(1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following

24

report and recommendation for the Honorable Ronald B. Leighton's review.

25

<u>FACTUAL AND PROCEDURAL HISTORY</u>

26

    Plaintiff is currently forty-eight years old.[1]  Tr. 38.  She has a high school education and has taken

27

28

    [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

some college-level course-work. Tr. 105.  She has past work experience as a bartender, waitress and construction worker. Tr. 22, 100, 113.

Plaintiff filed her applications for disability insurance and SSI benefits in September and October 2000, alleging disability as of July 5, 1999, due to arthritis, hepatitis, migraine headaches, depression, and a bipolar disorder. Tr. 21-22, 83, 99, 368-69.  Her applications were denied initially and on reconsideration. Tr. 38-39, 43-46, 49-51, 366-67, 372-78.

Plaintiff requested a hearing, which was held before an administrative law judge ("ALJ") on February 19, 2002. Tr. 392.  At the hearing, plaintiff, represented by counsel, appeared and testified, as did a medical expert, a vocational expert and a lay witness. Tr. 392-464.  On January 20, 2004, the ALJ issued a decision, in which he determined plaintiff to be not disabled, specifically finding in relevant part that:

    (1)    at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity;

    (2)    at step two, plaintiff had "severe" impairments consisting of arthritis, a personality disorder, drug and alcohol abuse and addiction, and a mood disorder which was "more probable than not a substance induced mood disorder";

    (3)    at step three, plaintiff's impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

    (4)    at step four, plaintiff retained the residual functional capacity to perform less than a full range of light work, which precluded her from performing her past relevant work; and

    (5)    at step five, plaintiff (i) would not be able to perform competitive work and would therefore be found disabled if the effects of drug and alcohol use were factored into her residual functional capacity, and (ii) would not be under a disability, and therefore would be capable of performing other jobs existing in significant numbers in the national economy, if the effects of drug and alcohol abuse were not factored into her residual functional capacity.

Tr. 34-36.  On September 28, 2004, plaintiff's request for review of the ALJ's decision was denied by the Appeals Council, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. §§ 404.981, 404.1481.

On October 21, 2004, plaintiff filed a complaint with this court seeking judicial review of the ALJ's decision. (Dkt. #1).  Plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

    (a)    the ALJ erred in assessing plaintiff's credibility;

    (b)    the ALJ erred in assessing the credibility of the lay witness testimony and

statements in the record;

(c)     the ALJ erred in evaluating the medical evidence in the record;

(d)     the ALJ erred in assessing plaintiff's residual functional capacity; and

(e)     the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

For the reasons set forth below, the undersigned recommends the ALJ's decision be reversed and remanded for further administrative proceedings.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering,

REPORT AND RECOMMENDATION
Page - 3

1   the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at

2   834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811,

3   818 (8th Cir. 2003).

4        In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

5   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

6   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ

7   also may consider a claimant's work record and observations of physicians and other third parties regarding

8   the nature, onset, duration, and frequency of symptoms. Id.

9        Although plaintiff argues the ALJ erred in assessing her credibility, she does not state specifically

10  how the ALJ did so. A review of the ALJ's decision and the record in this case, however, reveals that the

11  ALJ's credibility assessment was in fact proper. First, the ALJ found plaintiff's "statements concerning her

12  impairments and their impact on her ability to work are not generally credible, particularly concerning her

13  alcohol and cocaine use." Tr. 28. The ALJ went on to explain in relevant part:

14       The claimant's urine testified [sic] positive for cocaine use on August 2, 2000 . . . and in
         September 2000 the claimant's treating psychiatrist questioned the claimant's credibility

15       on drug use . . . In October 2000 the claimant was using marijuana and cocaine but her
         primary substance was alcohol . . . The claimant was admitted to Kitsap Recovery

16       Center on November 16, 2000 for her alcohol, cocaine and cannabis abuse but she chose
         to leave and abort treatment on December 6, 2000. . . . On December 18, 2000 the

17       claimant was using marijuana and she was recovering from nasal use of cocaine. She
         had several drinks in the morning, coffee with Bailey's . . . In February 2001 the

18       claimant was "quite defensive" about her drinking history and she denied illicit drug use
         in January and February 2001 . . . In June 2001 the claimant acknowledged she

19       periodically returned to drugs under stress and she recently had some cocaine use . . . In
         September 2001 it was reported that the claimant [sic] history of alcoholism and

20       methamphetamine abuse [sic] in remission . . . but in November 2001 it was reported
         that the claimant continued to abuse substances and substance abuse treatment was

21       recommended . . . In February 2002 the claimant claimed to use alcohol infrequently
         with her last drink being two-[sic]months prior. She denied using marijuana over the

22       last year or methamphetamine since 2000. However, she has also admitted that she used
         rock cocaine and over the last six months she used it approximately eight times . . . In

23       February 2002 the claimant's mental health provider reported that the claimant's
         substance abuse and dependence always had the potential to negatively influence her. . .

24       The claimant testified that she last used cocaine three days prior to the hearing and
         stated she had not used alcohol since 1978 but then admitted to drinking alcohol

25       occasionally. The claimant's contradictory statements indicate less than full candor with
         regard to her ongoing substance abuse and cast a shadow over her other statements.

26
27  Id. The above findings are supported by the substantial evidence in the record, and, as noted by the ALJ,

    indicate that plaintiff has not been completely forthright in relating her history of alcohol and drug abuse.

28
    Tr. 146, 151-53, 159, 163, 167-68, 197-98, 201-02, 204, 206, 214, 219, 223, 226, 228-31, 278, 282, 294,

314, 323, 325, 327, 334, 338, 340-41, 352, 354, 356-57, 359, 361, 363-65, 400-02, 414.

The ALJ also discounted plaintiff's credibility for the following reason:

> The claimant complained of memory and concentration problems . . . but her most recent psychological evaluation dated February 2002 revealed that her cognitive functioning had improved from the previous evaluation one-[sic]year prior.  Her mental status evaluation showed her immediate memory, concentration, abstract thinking and judgment had improved over the last year . . . The claimant's treating mental health provider reported in February 2002 that the claimant had no apparent thought disorder or cognitive disorder . . . In August 2001 the claimant did well on the Folstein Mini-Mental Status Examination . . . Moreover, the claimant's activities of daily living, such as watching television, driving, reading, handling her own finances and attending group lectures is evidence of an ability to concentrate . . .

Tr. 28.  A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. <u>Regennitter v. Commissioner of SSA</u>, 166 F.3d 1294, 1297 (9th Cir. 1998).  Although there is evidence in the record to indicate plaintiff may have had some problems with concentration at times, that evidence also reveals that overall such problems were far from disabling, and other evidence in the record indicates that at other times she had no problems with concentration. Tr. 130, 134, 164-65, 167, 179, 183-84, 197-98, 201, 205-08, 230, 294, 325, 327, 355-58, 362, 364, 416, 418, 420. Accordingly, the ALJ did not err in discounting plaintiff's credibility for this reason.

The ALJ further discounted plaintiff's complaints of pain for lack of objective medical evidence in the record. Tr. 29; <u>Regennitter</u>, 166 F.3d at 1297.  There is little objective medical evidence in the record to support plaintiff's allegations of disability due to any physical impairments. Tr. 153, 189-93, 311-13, 315-16, 318-20, 335-36, 338, 340-42, 345.  Indeed, one physician noted in mid-September 2000, that plaintiff had "no current medical problems," other than her own claim of arthritis in her shoulder. Tr. 229.  In early September 2001, furthermore, she was told to "involve herself in physical activity." Tr. 336.  Therefore, the ALJ properly discounted plaintiff's credibility for this reason as well.

Finally, the ALJ discounted plaintiff's credibility because of her "other inconsistent statements," noting in particular that:

> The claimant complained of being isolated and avoidant, but during an interview in February 2001, she had to call a friend to coordinate shopping and potting plants . . . There are discrepancies in the record as to the reason the claimant's grandson was taken away from her . . . She claimed to have not renewed her drivers' license due to poor vision yet continues to drive.

Tr. 29, 163, 205, 228, 235, 360, 420-21.  While not all of these statements relate specifically to plaintiff's symptom testimony and complaints, they are indicative of a lack of credibility on the whole. <u>Smolen</u>, 80

F.3d at 1284 (ALJ may consider prior inconsistent statements concerning symptoms and other testimony that appears less than candid).  Accordingly, the ALJ did not err in discounting plaintiff's credibility for the above reasons.

II.    The ALJ Properly Assessed the Credibility of the Lay Witness Testimony and Statements

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent, 739 F.3d at 1395.  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff argues the ALJ failed to provide germane reasons for rejecting the lay witness testimony and statements in the record, but again does not explain how any of the reasons the ALJ did provide were insufficient.  With respect to the lay evidence in the record, the ALJ found as follows:

> The claimant's boyfriend, Dan VanGlider, in testimony indicated that he has lived with the claimant for one year and observed the claimant has difficulty walking due to pain. She often lies on the couch. Mr. VanGlider testified that the claimant is unable to finish her household chores because she is unable to stand for long periods of time.  He also stated that the claimant is depressed and that she takes medications for her emotional problems.  He testified that the claimant's situation worsened in the six months prior to the hearing.  It is noted that this statement is not consistent with the claim of disability for the extended period alleged.  Further, it is significant to note that until becoming unemployed he was away from the residence at least 40 hours per week.  To the extent that these statements support the claimant's excessive allegations, little weight is accorded these statements.  The financial interest of witness/roommate is noted.  The written statements of a prior boyfriend were noted at Exhibit 6E.
>
> The record also contains written statements from the claimant's mother . . . , which indicate that she no longer see [sic] her daughter often.  The claimant's mother's statements indicate that the claimant has emotional and physical problems and that she needs financial help.
>
> It is significant to note that the witness statements do not address substance abuse or its impact.  As these statements are not complete and have been prepared by individual's close to the claimant, more weight is assigned the medical records including those of the claimant's treatment provider.

Tr. 29. Plaintiff argues that the above lay witness statements and testimony corroborate her physical and mental limitations.  However, as discussed above, the ALJ properly discounted plaintiff's credibility on

1   these issues.  Thus, the ALJ did not err in rejecting the lay witness evidence to the extent they corroborated

2   plaintiff's allegations.  In addition, although some of the other reasons the ALJ provided for rejecting the lay

3   witness evidence may be suspect, because plaintiff has not set forth any further bases for challenging the

4   ALJ's findings on this issue, the undersigned will not address them here.

5   III.   The ALJ Erred in Evaluating the Medical Evidence in the Record

6          The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

7   medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

8   record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

9   ALJ.  Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, therefore, "the ALJ's

10  conclusion must be upheld."  Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595,

11  601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in

12  fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical

13  experts "falls within this responsibility."  Id. at 603.

14         In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

15  supported by specific, cogent reasons."  Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a

16  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

17  thereof, and making findings."  Id.  The ALJ also may draw inferences "logically flowing from the evidence."

18  Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the

19  ALJ's opinion."  Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

20         The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

21  either a treating or examining physician.  Lester, 81 F.3d at 830.  Even when a treating or examining

22  physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons

23  that are supported by substantial evidence in the record."  Id. at 830-31.  However, the ALJ "need not

24  discuss all evidence presented" to him or her.  Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393,

25  1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain why

26  "significant probative evidence has been rejected."  Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d

27  Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

28         In general, more weight is given to a treating physician's opinion than to the opinions of those who

do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings." <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001); <u>Magallanes</u>, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

> A.     <u>The ALJ Did Not Err in Declining to Give Controlling Weight to the Medical Expert's Opinion Regarding the Materiality of Plaintiff's Drug and Alcohol Abuse</u>

Under the Social Security Act, a claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination" that the claimant is disabled. <u>Bustamante v. Massanari</u>, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).  Similarly, the Social Security Regulations also require that the Commissioner determine whether "drug addiction or alcoholism is a contributing factor material to the determination of disability." <u>Id.</u> (citing 20 C.F.R. §§ 404.1535(a), 416.935(a)).

To determine whether a claimant's alcoholism or drug addiction is a materially contributing factor, the ALJ first must conduct the five-step disability evaluation process "without separating out the impact of alcoholism or drug addiction." <u>Id.</u> at 955.  If the ALJ finds the claimant is not disabled, "then the claimant is not entitled to benefits." <u>Id.</u>  If the claimant is found disabled "and there is 'medical evidence of [his or her] drug addiction or alcoholism,'" the ALJ proceeds "to determine if the claimant 'would still [be found] disabled if [he or she] stopped using alcohol or drugs.'" <u>Id.</u> (citing 20 C.F.R. §§ 404.1535, 416.935).  Thus, if a claimant's current limitations "would remain once he [or she] stopped using drugs and alcohol," and those limitations are disabling, "then drug addiction or alcoholism is not material to the disability, and the claimant will be deemed disabled." <u>Ball v. Massanari</u>, 254 F.3d 817, 821 (9th Cir. 2001).

Plaintiff argues the ALJ erred in finding the opinion of the medical expert, Dr. Norm Gustavson, as to the materiality of her drug and alcohol abuse was not entitled to controlling weight.  She asserts the ALJ improperly rejected that opinion on the basis that Dr. Gustavson placed great weight on her credibility and self-reports regarding her alcohol and drug abuse.  With respect to Dr. Gustavson's opinion, the ALJ found in relevant part as follows:

> Dr. Gustavson further testified that the substance abuse was not material . . . However, he based his opinion on the claimant's self-reports of substance abuse, assuming they were credible.  However, as explained elsewhere in this decision, there exist good reason [sic] for questioning the reliability of the claimant's statements concerning her drug and alcohol abuse.  Therefore, his opinion as to the materiality of the abuse is not given controlling weight.

Tr. 27, 30.[2]  The undersigned finds the ALJ's reasons for not giving controlling weight to Dr. Gustavson's opinion to be proper.

It is true that Dr. Gustavson deemed plaintiff's drug abuse to be fairly limited based on his reading of the record. Tr. 432, 436, 439-40.  For this reason, he did not agree with those sources in the record who found the diagnoses of bipolar disorder and depression "highly questionable" because of a more probable substance induced mood disorder. Tr. 432.  Dr. Gustavson also did not feel the differences between the two psychological evaluations provided by Michael Corpolongo, Ph.D. in 2001 and 2002, or the diagnosis of "rule out substance-induced mood disorder" provided by Donna M. Poole, MSN, ARNP, in early February 2001, were attributable to plaintiff's drug abuse for the same reason. Tr. 436, 438-39.

As discussed above, however, the ALJ properly found plaintiff to be not fully credible regarding her alcohol and drug abuse, and the evidence in the record clearly indicates plaintiff's substance abuse was far more problematic than Dr. Gustavson's testimony reveals.  In addition, it appears that plaintiff's problems with alcohol and drug abuse have lasted for longer than the two-year period referred to by Dr. Gustavson in his testimony. See Tr. 204, 229.

There also is medical evidence in the record that plaintiff's substance abuse may have a material effect on her psychological condition.  For example, in early February 2002, Dr. Corpolongo opined that while plaintiff's "current drug use may be more secondary to her affective disorder rather than an addictive problem," she appeared to be "self-medicating by smoking crack cocaine to control her emotional state." Tr. 364.  Further, Dr. Corpolongo felt that "[i]ncreased substance abuse may trigger and be prophetic of potential deterioration in mood that may signal another major depressive episode." Tr. 365.

It is true that because Ms. Poole is not an "acceptable medical source" as that term is defined in the Social Security Regulations, her opinions may be given "less weight" than to those of licensed physicians such as Dr. Gustavson, who is an acceptable medical sources. See Gomez v. Chater, 74 F.3d 967, 970-71

---

[2]Transcript page number 27 corresponds to page 8 of the ALJ's decision, whereas transcript page number 30 corresponds to page 7 of the ALJ's decision.  The remaining pages of the ALJ's decision appear to be in order.

REPORT AND RECOMMENDATION
Page - 9

1    (9th Cir. 1996) (acceptable medical sources include licensed physicians and licensed psychologists, not nurse

2    practitioners); 20 C.F.R. § 404.1513(a), (d).  Contrary to Dr. Gustavson, Ms. Poole opined in early

3    February 2002, that plaintiff's "substance dependence" was "likely to interfere with attendance and

4    punctuality," and that it "always has the potential to negatively influence her." Tr. 356, 359.

5          Dr. Corpolongo, however, is an examining physician, and thus his opinion in general is entitled to

6    greater weight than Dr. Gustavson's opinion. Lester, 81 F.3d at 830-31.  It is clear that both Ms. Poole and

7    Dr. Corpolongo felt plaintiff's continued substance abuse likely would have a significantly adverse effect on

8    her underlying psychological condition and her ability to function.  To that extent, their opinions were

9    consistent, and contradicted Dr. Gustavson's opinion that plaintiff's drug abuse was immaterial.  The ALJ,

10   therefore, was required to consider conflicting medical evidence in the record.  As such, he did not err in

11   declining to give controlling weight to Dr. Gustavson's opinion on this issue over those of Dr. Corpolongo

12   and Ms. Poole. See Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642.

13          B.      The ALJ Improperly Relied on Ms. Poole's Opinion Regarding Plaintiff's Work Absences to
                    Find Plaintiff Able to Work Absent Her Drug and Alcohol Abuse

14

15          On the other hand, the ALJ went too far when she relied on the early February 2002 opinion of Ms.

16   Poole to find plaintiff unable to perform competitive work when the effects of her alcohol and drug abuse

17   are factored into her residual functional capacity, but not otherwise.  With respect to that opinion, the ALJ

18   specifically found as follows:

19          [T]he claimant's drug and alcohol abuse is a severe impairment and has had a significant
            impact on her ability to function.  If the effects of drug and alcohol use are factored into
20          the claimant's residual functional capacity, she would be unable to meet the attendance
            requirements due to absences of more than three per month [citing to Ms. Poole's early
21          February 2002 opinion (Tr. 352-59)].  As competitive work requires less absence than
            three days per month, the claimant would not be able to perform competitive work.
22          Thus, if the effects of drug and alcohol use are factored into the claimant's residual
            functional capacity, she is not able to perform competitive work and would be found
23          disabled.

24   Tr. 33-34.  Plaintiff disagrees with defendant's assertion that Ms. Poole, as the primary treatment provider,

25   was in a better position than Dr. Gustavson to evaluate her drug and alcohol abuse.  There is no indication,

26   plaintiff argues, that Ms. Poole had any more information than Dr. Gustavson regarding such abuse, and

27   that, as a trained psychologist, Dr. Gustavson was in a better position to evaluate that abuse and its effects

28   on plaintiff's limitations.

           As noted above, the undersigned agrees with plaintiff that with respect to how her substance abuse

affects her ability to function, the opinion of Dr. Gustavson, as an "acceptable medical source," generally is entitled to greater weight than that of Ms. Poole. Thus, while as the primary care giver who saw plaintiff regularly for over a year, it seems more likely that Ms. Poole was in a better position to evaluate the nature and extent of plaintiff's alcohol and drug use, her opinion alone is insufficient to rebut the opinion of Dr. Gustavson on the issue of whether that abuse had a material affect on plaintiff's underlying psychological condition and/or her mental functioning.

Also as noted above, it is true that Ms. Poole's early February 2002 opinion is consistent with that of Dr. Corpolongo to the extent that those opinions indicated plaintiff's continued use of alcohol and drugs would significantly affect her underlying psychological condition. Ms. Poole further opined that plaintiff's impairments would cause her to be absent from work more than three times per month. Tr. 355. Although plaintiff argues Ms. Poole did not indicate whether these absences would be due to alcohol or drug abuse, Ms. Poole noted that plaintiff's prognosis depended upon her ability to abstain from such abuse, and that it was "likely to interfere with attendance and punctuality." Tr. 354, 356, 359.

Nevertheless, Dr. Corpolongo did not opine that plaintiff would have work absence issues as the result of her substance abuse. In addition, while Dr. Corpolongo did state plaintiff continued to be "unable to sustain gainful employment," it is not clear he believed this inability was attributable to her substance abuse, or if so, to what extent. Tr. 364. No other medical source in the record, furthermore, has indicated the extent to which, if any, plaintiff's attendance and punctuality was affected by her alcohol and/or drug abuse. This is not to say that her substance abuse is immaterial to a determination as to whether or not she is disabled. Indeed, this is one of the issues the Commissioner will need to further determine on remand. Rather, the record contains insufficient medical evidence to justify the ALJ's sole reliance on Ms. Poole's opinion to support his findings here.

C.  The ALJ Erred in Adopting the Mental Functional Limitations Found by Plaintiff's Mental Health Treatment Provider

Plaintiff next argues the ALJ erred in determining she had the mental functional limitations found by Ms. Poole. In her early February 2002 opinion, Ms. Poole found many of plaintiff's mental abilities to perform unskilled work to be "good" (defined as "limited but satisfactory"), while she found several others to be only "fair" (defined as "seriously limited, but not precluded"). Tr. 355-57. The ALJ adopted these limitations, finding that they were "consistent with the ability to perform simple routine repetitive tasks, to

wit: unskilled work." Tr. 31.  Plaintiff asserts the ALJ erred in adopting these limitations over those found by Dr. Gustavson and Bruce Eather, Ph.D., another non-examining consulting physician.  The undersigned agrees.

Dr. Eather completed a mental residual functional capacity assessment form in mid-April 2001, in which he found plaintiff to be moderately limited in a number of different mental functional areas. Tr. 183-85.  With respect to many of these areas, Ms. Poole had found plaintiff to be "limited but satisfactory." Tr. 355-57.  Although the form used by Dr. Eather does not define the term "moderately limited," this rating is one rating above the rating of "not significantly limited." Tr. 183-85.  As such, it appears more analogous to "seriously limited, but not precluded" than to "limited but satisfactory."  Thus, the limitations found by Dr. Eather, an acceptable medical source, contradict those found by Ms. Poole.

In addition, at the hearing, the ALJ inquired as to whether Dr. Gustavson agreed with the moderate limitations found by Dr. Eather. Tr. 445.  For the most part, Dr. Gustavson agreed with those limitations, although he did testify that in some of the mental functional areas where Dr. Eather found plaintiff to be moderately limited, plaintiff was not significantly limited. Tr. 446-48.  Thus, Dr. Gustavson's testimony on the issue of plaintiff's mental functional limitations appears to be largely consistent with the opinion of Dr. Eather.  In any event, both medical sources found plaintiff to have greater limitations in these areas than did Ms. Poole.  The ALJ, however, provided no explanation as to why he chose to adopt the opinion of Ms. Poole over those of two acceptable medical sources.

In a narrative assessment attached to the end of his mental residual functional capacity assessment form, Dr. Eather opined that plaintiff essentially would be able to perform simple, repetitive work, which the ALJ did note in his decision. Tr. 31, 187.  The ALJ further stated that Dr. Eather's opinion supported a finding of not disabled, presumably finding the narrative assessment to be consistent with the findings of Ms. Poole regarding plaintiff's mental functional limitations. Tr. 32.  Again, however, the ALJ did not explain why he gave more weight to this assessment than to the more specific moderate limitations noted by Dr. Eather elsewhere on the same form.  In addition, not all of the moderate limitations found by Dr. Eather dealt with plaintiff's ability to perform simple, repetitive work.  As such, the ALJ erred in relying on the limitations found by Ms. Poole.

Defendant asserts that plaintiff's argument that Dr. Gustavson's opinion is consistent with that of

REPORT AND RECOMMENDATION
Page - 12

Dr. Eather is not persuasive, and that the opinions of Dr. Corpolongo and Ms. Poole are entitled to more weight.  Defendant, however, does not explain how plaintiff's argument is unpersuasive.  Indeed, as noted above, on the issue of plaintiff's mental functional limitations, the opinions of Drs. Gustavson and Eather do appear to be largely consistent, which the ALJ in fact noted. Tr. 30.  Further, while the opinion of Dr. Corpolongo may be entitled to more weight on the issue of the materiality of plaintiff's substance abuse, as discussed above, he provided no specific opinion regarding her specific mental functional limitations.  It is true that Dr. Corpolongo did state plaintiff could not be "sufficiently reliable, consistent, or focused to be employable." Tr. 364.  However, also as discussed above, it is not clear to what extent, if any, he attributed plaintiff's inability to sustain employment on her alcohol and drug abuse.

On the other hand, as with the issue of the materiality of plaintiff's alcohol and drug abuse, this is not to say the ALJ was required to adopt the opinions of Drs. Gustavson and Eather regarding her mental functional limitations.  At the same time that Dr. Eather filled out the mental residual functional capacity assessment form, he also completed a psychiatric review technique form.  In that latter form, Dr. Eather found plaintiff to have moderate difficulties in maintaining social functioning, concentration, persistence and pace, and one or two episodes of decompensation. Tr. 179.

Dr. Eather also stated, however, that his findings were based in part on a diagnosis of substance addiction disorders, which are defined as "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." Tr. 169, 177.  Thus, it appears that Dr. Eather may have felt plaintiff's mental functional limitations were affected to at least some extent by her substance abuse.  In addition, as discussed above, the evidence in the record reveals that Dr. Gustavson underestimated the nature and extent of that abuse.  Thus, on remand, the Commissioner shall further consider to what extent, if any, the mental functional limitations found by Dr. Gustavson and Dr. Eather have been affected by plaintiff's alcohol and drug abuse.

IV.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at

1   step five to determine whether he or she can do other work. Id.  It is what the claimant "can still do despite

2   his or her limitations." Id.

3          A claimant's residual functional capacity is the maximum amount of work the claimant is able to

4   perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

5   must result from his or her "physical or mental impairment(s)." Id.  The ALJ, therefore, must consider only

6   those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

7   claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

8   related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

9   medical or other evidence." Id. at *7.

10         The ALJ assessed plaintiff with the residual functional capacity to do work at the light exertional

11  level, "reduced by additional limitations related to her mental impairments." Tr. 31.  As noted above, the

12  ALJ adopted the mental functional limitations found by Ms. Poole in her early February 2002 opinion,

13  which the ALJ determined to be "consistent with the ability to perform simple routine repetitive tasks," or

14  unskilled work. Id.  Plaintiff argues the ALJ instead should have included the mental functional limitations

15  set forth in the second hypothetical question the ALJ posed to the vocation expert, which corresponded

16  with many of the moderate limitations found by Dr. Eather and Gustavson. Tr. 460-61.  Plaintiff further

17  argues that while the ALJ accepted Ms. Poole's opinion that plaintiff was "seriously limited, but not

18  precluded" in a number of mental functional areas, the ALJ did not explain how those limitations were

19  consistent with the ability to perform unskilled work.

20         The undersigned agrees with plaintiff to the extent that the ALJ erred in crediting the opinion of Ms.

21  Poole regarding plaintiff's mental functional limitations over those of Dr. Eather and Dr. Gustavson.  The

22  undersigned also agrees that the ALJ erred in failing to explain how some of the mental functional

23  limitations Ms. Poole found to be "seriously limited, but not precluded" – such as the ability to maintain

24  attention, accept instructions, and deal with normal work stress (Tr. 355-56) – were consistent with the

25  ability to perform unskilled work.  Again, however, as discussed above, it is unclear from the evidence in

26  the record the extent to which plaintiff's substance abuse affects her ability to function in these areas.  On

27  remand, therefore, the Commissioner shall reconsider the affect that abuse has had on plaintiff's mental

28  functional limitations and residual functional capacity, and then the extent to which her residual functional

1   capacity remains impacted by her limitations absent the substance abuse.

2   V.      The ALJ Improperly Found Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

3          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

4   process the ALJ must show there are a significant number of jobs in the national economy the claimant is

5   able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ

6   can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-

7   Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157,

8   1162 (9th Cir. 2000).

9          An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

10  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

11  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

12  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

13  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

14  the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

15  description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

16  (because ALJ included all limitations that he found to exist, and those findings were supported by

17  substantial evidence, ALJ did not err in omitting other limitations claimant failed to prove).

18         The ALJ posed the following hypothetical question to the vocational expert:

19         I'd like for you to presume an individual who is a younger individual at 42 years of age.
           This person has a high school education, no completed vocational education or college.
20         There are basic skills in reading and mathematics.  This individual is able to occasionally
           lift 20 pounds, to frequently lift ten pounds, is able to stand or walk with normal breaks
21         for six hours in an eight-hour day, is able to sit with normal breaks for six hours in an
           eight-hour day.  This individual is able to never climb ladders, ropes and scaffolds but
22         may occasionally climb ramps and stairs and may occasionally balance, stoop, kneel,
           crouch, and crawl.  This person should avoid concentrated exposure to vibration, to
23         fumes, odors, dust, and gases and to hazards.

24  Tr. 459.  Based on this hypothetical question, the vocational expert testified that plaintiff could perform the

25  jobs of cashier II and small products assembler. Tr. 459-60.  In his decision, the ALJ found plaintiff to be

26  capable of performing both of these jobs, along with the jobs of counter clerk and call-out operator, based

27  on a prior agency determination. Tr. 33.  The ALJ also posed the following second hypothetical question to

28  the vocational expert:

I'm going to add to this hypothetical a mental residual functional capacity. This individual has a moderate limitation in the ability to perform activities within a regular schedule, maintain -- within a schedule, maintain regular attendance and be punctual within customary tolerances. A moderate limitation in the ability to work in coordination with or proximity to others without being distracted by them, and a moderate limitation in the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. A moderate limitation in the ability to interact appropriately with the general public. A moderate limitation in the ability to accept instructions and respond appropriately to criticism from supervisors. A moderate limitation in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. A moderate limitation in the ability to respond appropriately to changes in the work setting.

Tr. 460-61. Based on this additional hypothetical question, the vocational expert testified that plaintiff could not perform the jobs of cashier II and small product assembler, or any other work in the national economy. Tr. 461.

Plaintiff argues the ALJ erred in finding her capable of performing any of the above four jobs. This is because, plaintiff asserts, the ALJ limited plaintiff to simple routine repetitive tasks in the assessment of her residual functional capacity and in the hypothetical questions posed to the vocational expert, whereas the Dictionary of Occupational Titles ("DOT") defines each of those jobs to require the ability to perform reasoning at a higher level. Plaintiff further argues the ALJ did not explain this conflict between the DOT and the vocational expert's testimony, as the ALJ is required to do.

The jobs of cashier II (DOT 211.462-010) and call-out operator (DOT 237.367-014) are defined to require "Level 3" reasoning, while the jobs of small products assembler (DOT 706.684-022) and counter clerk (DOT 249.366-010) are defined to require "Level 2" reasoning. The DOT defines Level 1 through 3 reasoning as follows:

LEVEL 3

Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

LEVEL 2

Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

LEVEL 1

Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these

1   situations encountered on the job.

2   DOT, Appendix C.  Although not so expressly stated, plaintiff appears to be arguing that the limitation to

3   simple routine repetitive tasks is analogous to "Level 1" reasoning, which would preclude her from being

4   able to perform jobs requiring Level 2 or Level 3 reasoning.

5          Defendant argues that each of the above jobs the ALJ found plaintiff capable of performing have a

6   specific vocational preparation ("SVP")[3] of 2, which, according to SSR 00-4p, corresponds to unskilled

7   work. SSR 00-4p, 2000 WL 1898704 *3.  Defendant further argues that plaintiff has not produced any

8   evidence that she is incapable of performing unskilled work, which the Social Security Regulations define as

9   follows:

10         Unskilled work is work which needs little or no judgment to do simple duties that can be
           learned on the job in a short period of time. The job may or may not require considerable
11         strength. For example, we considered unskilled jobs if the primary work duties are
           handling, feeding and off bearing (that is, placing or removing material from machines
12         which are automatic or operated by others), or machine tending, and a person can
           usually learn to do the job in 30 days, and little specific vocational preparation and
13         judgment are needed.

14  See 20 C.F.R. §§ 404.1568, 416.968.  Defendant's argument is unpersuasive.  First, in defining the terms

15  separately, the DOT clearly distinguishes between a job's SVP level and the level of reasoning required to

16  perform that job.  See DOT, Appendix C.  Indeed, a plain reading of the DOT's definitions of these terms

17  indicate that they refer to two very distinct categories.  Second, the above definition of unskilled work does

18  not necessarily exclude the requirement that a worker be capable to following more detailed or complex

19  instructions, although the duties themselves may be "simple" or capable of being learned in a short period of

20  time, and it makes no mention of the terms "routine" or "repetitive."

21         Defendant next argues that the DOT's definitions of Level 2 and Level 3 reasoning themselves do

22  not necessarily preclude work involving simple routine, repetitive tasks.  However, the definition of Level 1

23  reasoning expressly references "simple one- or two-step instructions," whereas the definitions of Level 2

24  and Level 3 reasoning clearly deal with more "detailed" instructions involving a few to several "concrete

25  variables."  It is true that the term "detailed" is modified by the phrase "but uninvolved" in the definition of

26  Level 2 reasoning.  However, the more commonsense and logical reading of the DOT's definitions of the

27

28         [3]The DOT defines the term SVP as "the amount of lapsed time required by a typical worker to learn the techniques,
    acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT,
    Appendix C.

REPORT AND RECOMMENDATION
Page - 17

1    above three levels of reasoning would indicate that Level 1 reasoning is much more analogous to the ability

2    to perform simple routine repetitive work tasks than the other two levels.

3            Defendant argues that because plaintiff was able to work as a bartender/waitress in 1999, jobs that

4    both required Level 3 reasoning, and there is no evidence to indicate that plaintiff's intellectual functioning

5    deteriorated over the years, there also is no reason to think that she could not now perform the jobs the ALJ

6    identified.  It was the ALJ herself, however, who, based on the evidence in the record, limited plaintiff to

7    performing simple routine repetitive tasks.  Because, as discussed above, plaintiff's argument that such a

8    limitation is more analogous to Level 1 reasoning than it is to Level 3 reasoning is more persuasive, this

9    argument also is without merit.

10           Finally, defendant argues that based on the DOT's description of the duties involved in performing

11   the jobs of cashier II and small products assembler, plaintiff's limitation to simple routine repetitive work

12   does not preclude her from performing those jobs.  Even if the undersigned were to ignore the fact that, as

13   discussed above, the DOT defines both jobs as requiring Level 3 reasoning, defendant's arguments is still

14   without merit.  According to the DOT, to perform the job of cashier II, a person must, among other things,

15   be able to compute bills and itemize lists, use an adding machine or cash register, record amounts received,

16   prepare reports of transactions, operate ticket-dispensing machines, and give cash refunds or issue credit

17   memorandums.  DOT 211.462-010.  It can hardly be said that such tasks are simple, routine or repetitive in

18   nature.  In addition, while the job of small products assembler does involve repetitive tasks, to be able to do

19   that job, a person must be capable of performing any combination of such tasks, work as a member of an

20   assembly group, load and unload machines to perform various tasks, and may be assigned to different work

21   stations as production needs require.  DOT 706.684-022.

22           That being said, it must be noted that the ALJ did not limit the plaintiff to simple routine repetitive

23   tasks in either of the hypothetical questions she posed to the vocational expert, although, as discussed

24   above, the ALJ did adopt this limitation in her assessment of plaintiff's residual functional capacity.  In other

25   words, since the vocational expert was not presented with this limitation, there was no conflict between the

26   vocational expert's testimony and the DOT.  However, as discussed above, the limitation to simple routine

27   repetitive work does appear to conflict with the requirements of the four jobs the ALJ found plaintiff able to

28   perform, as those jobs are defined by the DOT.  In addition, the ALJ further found as follows:

> The final mental residual functional capacity adopted herein is that set forth by the claimant's treatment provider.  Notwithstanding this change from the hypothetical submitted to the vocational expert, the conclusion that the claimant is able to perform simple, routine, repetitive work remains the same.  Therefore, it is concluded that the claimant is able to perform the work [identified by the vocational expert and the prior agency determination].

Tr. 33.  Thus, it seems clear that had the ALJ included this limitation in his second hypothetical question to the vocational expert, there indeed would have been a conflict with the DOT.

The ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704.  Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ is required to "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1.  Relying on Donahue v. Barnhart, 279 F.3d 441 (7th Cir. 2002), defendant argues the ALJ must explain a conflict with the DOT only where that conflict has been brought to the attention of the ALJ at the hearing.

The decision in Donahue, however, is not binding on this court.  In Donahue, the Seventh Circuit analogized to the Federal Rules of Evidence to find that the ALJ is required to make the requisite inquiry only when the basis of the vocational expert's conclusions is questioned at the hearing. Id. at 446-47.  The Seventh Circuit also read SSR 00-4p to require the ALJ to "[e]xplain [in the] determination or decision how any conflict [with the *Dictionary*] that *has been identified* was resolved." Id. at 446 (citing to SSR 00-4p) (emphasis in the original).  However, the undersigned finds the reasoning put forth by the Tenth Circuit in Haddock to be more persuasive.

In Haddock, the Tenth Circuit noted that the ALJ "has a duty to fully develop the record even when the claimant is represented by an attorney." 196 F.3d at 1091.  This is in accord with the Ninth Circuit's holding on this issue. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001).  The Tenth Circuit then went on to state:

> Questioning a vocational expert about the source of his opinion and any deviations from a publication recognized as authoritative by the agency's own regulations falls within this duty.

Haddock, 196 F.3d at 1091.  The reasoning of the Tenth Circuit also appears to be much more in line with the plain requirements of SSR 00-4p, which places an "affirmative responsibility" on the ALJ to ask the vocational expert "about any possible conflict" between the evidence provided by the vocational expert and

the information provided in the DOT, and, if there appears to be such a conflict, to "obtain a reasonable explanation for the apparent conflict." SSR 00-4p, 2000 WL 1898704 *4. Accordingly, on remand the Commissioner shall obtain additional vocational expert testimony regarding the effect that the limitation to simple routine repetitive work has on plaintiff's ability to perform the jobs the ALJ found her capable of performing, including a reasonable explanation for any conflict with the DOT.

VI.   This Case Should Be Remanded for Further Administrative Proceedings

The court may remand a case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Id.; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
> evidence, (2) there are no outstanding issues that must be resolved before a
> determination of disability can be made, and (3) it is clear from the record that the ALJ
> would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because there still remain issues to be resolved concerning the materiality of plaintiff's substance abuse, plaintiff's mental functional limitations, and plaintiff's ability to perform other work existing in significant numbers in the national economy, this matter should be remanded to the Commissioner for further administrative proceedings.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and remand this case to the Commissioner for further administrative proceedings.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit

/ / / / /

/ / / / /

/ / / / /

imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **August 26, 2005**,

1   as noted in the caption.

2        DATED this 29th day of July, 2005.

Karen L. Strombom
United States Magistrate Judge